IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION


M.D., a minor, by and          )
through his next friends       )
and parents, Carlton           )
and Patricia Daniels,          )
                               )
     Plaintiff,                )
                               )        CIVIL ACTION NO.
     v.                        )          3:04cv877-MHT
                               )             (WO)
LLOYD SMITH, Lee County        )
Sheriff Deputy, in his         )
individual capacity,           )
                               )
     Defendant.                )


OPINION

Plaintiff M.D., a minor, brings this lawsuit against

defendant Lloyd Smith, in his individual capacity, under

the Fourth and Fourteenth Amendments to the United States

Constitution, as enforced through 42 U.S.C.A. § 1983, and

under Alabama state law.[1]   According to M.D., Deputy

_____

1.   Pursuant to an order dated August 8, 2005, Jimmy
Taylor has been dismissed as a defendant, and M.D.'s
request for equitable relief and claim against Smith for
intentional infliction of emotional distress have been
dismissed.

Sheriff Smith forcefully removed M.D. from his car, slammed his head against the trunk of the car, and frisked him. M.D. asserts that the search and seizure of his person was unreasonable and the amount of force used was excessive, all in violation of federal law; he also asserts that Smith's conduct constituted an assault under state law. Jurisdiction over M.D.'s federal claims is proper under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights); jurisdiction over his state-law claim is proper under 28 U.S.C. § 1367 (supplemental jurisdiction).

This case is currently before the court on Deputy Sheriff Smith's motion for summary judgment. For the reasons that follow, that motion will be denied on M.D.'s Fourth Amendment excessive-force claim and granted in all other respects. The excessive-force claim will go to trial.

## I.   SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Under Rule 56, the party seeking summary judgment must first inform the court of the basis for the motion, and the burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986);  see also Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (discussing burden-shifting under Rule 56).  The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  In doing so, the court must view the

3

evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).


## II. BACKGROUND

The following facts are construed in M.D.'s favor as the non-moving party:  On January 16, 2004, School Resource Officer Dawn Majors requested backup based on an anonymous tip that someone would bring a gun to Beauregard High School after school had been dismissed for the day.  Deputy Sheriff Smith was dispatched to the school, along with three other officers.  When school was dismissed, Majors became concerned that a fight had broken out.  She requested that the other officers order students in the school parking lot to leave campus.[2]

---

2.  Defendant's brief in support of motion for summary judgment (Doc. No. 18), Ex. C, Special Report of Dawn Majors, p. 1-2.

4

A few minutes later, Deputy Sheriff Smith encountered M.D., who  was sitting in his vehicle preparing to leave campus; M.D. could not leave the school grounds at that time, however, because another car was blocking him from safely backing out of his parking space.  At this point, numerous students, including M.D., still remained in the parking lot.[3]  Smith approached the passenger window of M.D.'s car and ordered him to vacate the premises.[4]  M.D. did not hear Smith and replied, "Excuse me?"[5]  Smith then moved to the driver side of the vehicle and ordered M.D. out of the vehicle.   When M.D. asked, "What was happening?," Smith again ordered M.D. out of his vehicle. As M.D. attempted to exit his vehicle, Smith pulled him from the car and slammed him against it.  As a result,

---

3.  Plaintiff's brief in opposition of motion for summary judgment (Doc. No. 28), Ex. A, Deposition of M.D., pp. 105, 123-34.

4.  Id., Ex. B, Deposition of Lloyd Smith, pp. 46, 48.

5.  M.D. says he never to have heard Smith order him to leave the premises.  Id., Ex. A, Deposition of M.D., pp. 126, 134.

M.D.'s head hit the car, causing a dent on the trunk and a red mark on M.D.'s forehead.[6]  Smith then frisked M.D.[7]

At some point after being frisked, M.D. reached into his pocket for his cell phone to call his parents.  Smith again restrained M.D. and frisked him.[8] As the encounter unfolded, M.D. began to yell for someone to help him, and at least two other officers came to assist Smith.[9]  M.D. was eventually released and left the school premises. The entire incident lasted approximately 25 minutes.[10]

Smith did not formally arrest M.D. during the incident, but ultimately filed a petition against M.D. in

---

6.  Id., Ex. A, Deposition of M.D., p. 105, 125.

7.  Id., Ex. B, Deposition of Lloyd Smith, p. 60.

8.  Defendant's brief in support of motion for summary judgment (Doc. No. 18), Ex. G, Deposition of M.D., p. 133.

9.  Id., Ex. C, Special Report of Dawn Majors, p. 1; id., Ex. G, Deposition of M.D., p. 152.

10. Plaintiff's brief in opposition of motion for summary judgment (Doc. No. 28), Ex. B, Deposition of Lloyd Smith, p. 72.

juvenile court.[11]   Smith admits that he possessed no evidence suggesting that M.D. was the armed suspect or otherwise posed a danger to officer safety, and he admits that M.D. never refused to comply with his order.[12]   As a result of M.D.'s behavior during these events, M.D. was adjudged delinquent in the family division of an Alabama state court.[13]

───────────────

11. <u>Id</u>., p. 74.

12. <u>Id</u>., pp. 51, 61-62.   M.D. also submitted deposition testimony in which Smith admits that he is "suspicious of everybody" and always frisks anyone he encounters.  <u>Id</u>., p. 62.  This reflects that Smith makes a regular practice of frisking stopped persons without individualized suspicion that they may be armed or dangerous.   However, what Smith has done in other circumstances is not relevant to this case.   <u>See</u> <u>infra</u> Part IV.A.1.i.b. (explaining that officers must have individualized suspicion that a particular stopped person is armed or dangerous before conducting a frisk).

13. <u>See</u> Defendant's brief in support of motion for summary judgment (Doc. No. 18), Ex. G, Deposition of M.D., p. 169.

## III. FOURTEENTH AMENDMENT:
## SUBSTANTIVE-DUE-PROCESS CLAIM

M.D. claims that Deputy Sheriff Smith unreasonably searched and seized him and used "excessive, unreasonable and unjustifiable force" against him, in particular by removing M.D. from his car and shoving his head on the trunk of his vehicle.  Complaint (Doc. No. 1), ¶¶ 14, 21. "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing' such a claim." Albright v. Oliver, 510 U.S. 266, 273 (1994) (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)).  The Fourth Amendment provides exactly the constitutional protections that M.D. seeks.  See Albright, 510 U.S. at 274 ("The Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it."); Graham, 490 U.S. at 395 ("[T]he Fourth Amendment provides an explicit textual source of constitutional

8

protection against [excessive force]").  Accordingly, M.D.'s § 1983 substantive-due-process claim under the Fourteenth Amendment fails as a matter of law.

### IV. FOURTH AMENDMENT: SEARCH-AND-SEIZURE AND EXCESSIVE-FORCE CLAIMS

The only § 1983 claims that remain against Deputy Sheriff Smith are for violating M.D.'s Fourth Amendment right.  M.D. asserts two claims: first, Smith unreasonably searched and seized him and, second, Smith used excessive force to effectuate the frisk.  Smith responds with two defenses on each claim: first, each claim is barred by qualified immunity and, second, each claim is precluded because an Alabama juvenile court adjudicated M.D. delinquent for his conduct during the incident.

## A. Qualified Immunity

The qualified-immunity doctrine insulates government employees from civil trials and other litigation burdens against them, in their individual capacities, stemming from actions taken pursuant to their discretionary authority.  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  In determining whether a public employee is entitled to qualified immunity, a two-step analysis is undertaken.  Sims v. Metropolitan Dade County, 972 F.2d 1230, 1236 (11th Cir. 1992).  First, the defendant must establish "that he or she acted within the scope of discretionary authority when the allegedly wrongful acts occurred."  Id.  Once this is proven, the burden shifts to the plaintiff to prove that the defendant's actions violated clearly established statutory or constitutional law.  Sims, 972 F.2d at 1236.  "The threshold inquiry [at the second stage of the qualified-immunity analysis] is whether plaintiff's assertions, if true, establish a constitutional violation."  Hope v. Pelzer, 536 U.S. 730,

10

736 (2002).   If a constitutional violation occurred, public employees are shielded from liability "if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   Id. at 739.

Surprisingly, M.D. disputes whether Deputy Sheriff Smith was acting within his discretionary capacity, despite the fact that the complaint describes Smith as "at all times relevant to this complaint, [acting as] a duly appointed ... officer [] of the Sheriff's Department of Lee County."   Complaint (Doc. No. 1), ¶ 7.   As a deputy sheriff in uniform, on duty, and acting pursuant to requests from a fellow officer, Smith was clearly acting within his discretionary capacity.

### 1. Unreasonable search-and-seizure claim
#### i. Constitutional violation

The Fourth Amendment prohibits "unreasonable searches and seizures."   U.S. Const., Amend. IV.   The appropriate

inquiry under the Fourth Amendment is an objective one:
"[W]ould the facts available to the officer at the moment
of the seizure or the search warrant a man of reasonable
caution in the belief that the action taken was
appropriate?"  Terry v. Ohio, 392 U.S. 1, 21-22 (1968)
(quotation marks omitted).  The general rule is that
"searches and seizures conducted outside the judicial
process, without [a warrant], are per se unreasonable
under the Fourth Amendment--subject only to a few
specifically established and well delineated exceptions."
 Minnesota v. Dickerson, 508 U.S. 366, 373 (1993).

    A so-called 'Terry stop' is one such exception.
"[A]n officer may, consistent with the Fourth Amendment,
conduct a brief, investigatory stop when the officer has
a reasonable, articulable suspicion that criminal
activity is afoot," Illinois v. Wardlow, 528 U.S. 119,
123 (2000) (citing Terry, 392 U.S. at 30), and, if the
officer has reasonable suspicion that the stopped person
may be armed or dangerous, the officer may also conduct
a protective frisk.  Terry, 392 U.S. at 24.  Although

12

reasonable suspicion is less demanding than probable cause, an officer must have at least a minimal level of objective justification for making a <u>Terry</u> stop. <u>Wardlow</u>, 528 U.S. at 123.

Therefore, for the stop, "[t]he officer must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity," <u>id</u>. at 123-24 (quoting <u>Terry</u>, 392 U.S. at 27); and, for the frisk, "reason to believe that he is dealing with an armed and dangerous individual." <u>Terry</u>, 392 U.S. at 27. As to the latter, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." <u>Id</u>. "And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." <u>Id</u>.

This court must apply these principles to both the stop and the frisk of M.D.   See Brent v. Ashley, 247 F.3d 1294, 1299 (11th Cir. 2001) (analyzing each stage of an encounter between law-enforcement agents and a plaintiff separately).

a. The Stop.   In Alabama, "a person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he ... [c]ongregates with other person[s] in a public place and refuses to comply with a lawful order of the police to disperse." 1975 Ala. Code § 13A-11-7.   It is clear that a student's refusal to leave campus in this situation was likely to create public alarm.   Both parties agree that M.D. did not immediately comply with Deputy Sheriff Smith's order to vacate the premises.[14]   Smith was therefore justified in ordering M.D. to exit his vehicle to investigate whether M.D. had

_____

14. Even if M.D. failed to comply because he did not hear Smith's order, nothing in the record demonstrates that Smith was aware that M.D. had not heard him.

14

intended to cause alarm in violation of Alabama's
disorderly conduct statute.

b. The Frisk.  Deputy Sheriff Smith's reasonable
suspicion that M.D. was disorderly does not, however,
automatically justify Smith's decision to throw M.D.
against the car and frisk him.  See Brent, 247 F.3d at
1300 (noting that as a stop ripens into a frisk an
officer "must reevaluate whether reasonable suspicion to
justify the next level of intrusion exists in light of
the information gained during the encounter").  There are
several possible justifications for the frisk: the frisk
was a valid search incident to a lawful arrest; students
have lowered expectations of privacy on school grounds;
and, under the Terry standard, "a reasonably prudent
[officer] in the circumstances would be warranted in the
belief that his safety or that of others was in danger,"
Terry, 392 U.S. at 27.  The court will consider each in
turn.

The threshold inquiry is whether Deputy Sheriff Smith
arrested M.D.; if he did, the frisk was valid as a search

15

incident to a lawful arrest. "It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment." <u>United States v. Robinson</u>, 414 U.S. 218, 224 (1973). However, the exception applies only if an officer makes a custodial arrest. <u>Knowles v. Iowa</u>, 525 U.S. 113, 117 (1998); <u>see also</u> <u>Robinson</u>, 414 U.S. at 234-35 ("[T]he danger to an officer is far greater in the case of the extended exposure which follows the taking of a suspect into custody ... than in the case of the relatively fleeting contact resulting from the typical <u>Terry</u>-type stop."). Because the record is clear that Smith did not arrest M.D., this exception does not apply.[15]

_____

15. To be sure, a seizure may become a de facto arrest even if the officer does not formally arrest the suspect. <u>United States v. Acosta</u>, 363 F.3d 1141, 1144-46 (11th Cir. 2004). However, "an investigatory stop does not necessarily ripen into an arrest because an officer draws his weapon, handcuffs a suspect, orders a suspect to lie face down on the ground, or secures a suspect in the back of a patrol car." <u>Id</u>. at 1147. Under precedent from the Eleventh Circuit Court of Appeals, Smith's frisk
(continued...)

The Supreme Court's decision in <u>Devenpeck v. Alford</u>, 543 U.S. 146 (2004), does not alter this conclusion.  In <u>Devenpeck</u>, the Court held that the subjective intent for an arrest is irrelevant: Even if the stated basis for the arrest is flawed, the officer is excused if another basis, supported by probable cause, existed to arrest the suspect.  543 U.S. at  Id. at 153-156.  The Court based its holding on the "arbitrary consequences," <u>id</u>. at 155, that would result from subjective inquiries.  If two officers arrest a suspect on identical facts supporting probable cause, one arrest could be constitutional and the other unconstitutional if the latter officer failed to identify correctly "a general class of offense for which probable cause exists."  <u>Id</u>. at 154.  While not directly on point, <u>Devenpeck</u> could be read to stand for the broad proposition that, as long as objective grounds

_____

15.(...continued)
of M.D. was inadequate to transform this stop into a de facto arrest.

17

exist to arrest a suspect, failure to do so actually is irrelevant.

Such an expansive reading of Devenpeck would not help Deputy Sheriff Smith here. Although Smith may have possessed reasonable suspicion that M.D. was being disorderly, the record viewed in the light most favorable to M.D. reveals that Smith lacked probable cause to arrest M.D. on that charge when he frisked him. Smith possessed no evidence that M.D. intended to cause alarm or was aware that his failure to comply with Smith's order might cause alarm. Such an expansion of Devenpeck would also conflict with Knowles v. Iowa, 525 U.S. 113 (1998). There, the Supreme Court held that an officer making a traffic stop may not conduct a full search incident to arrest unless the officer actually arrests the suspect. 525 U.S. at 117. In reaching this conclusion, the Court found that traffic stops were analogous to Terry stops, and the rationales supporting a search incident to an arrest are inapplicable in Terry stops and traffic stops alike. Id. at 117-18. Even if

18

Smith did have probable cause to arrest M.D. for disorderly conduct, Devenpeck did not overrule, or for that matter mention, Knowles. Devenpeck was limited to whether an arrest is constitutional, and did not address Terry stops or the search-incident-to-a-lawful-arrest exception to the warrants requirement. Absent an express indication that the Court has repudiated its long-established jurisprudence on searches incident to a lawful arrest, this court cannot simply ignore Knowles. This is especially true because the determination of whether an arrest was actually made is entirely objective. Thus, the decisive rationale of Devenpeck, that a subjective inquiry would result in arbitrary results under the Fourth Amendment, see 125 S. Ct. at 594, is wholly inapplicable here.

Because M.D. was not under arrest, the court must determine whether the frisk was justified on other grounds. As noted, the encounter occurred on school grounds. Because students in the school environment generally have lower expectations of privacy than do

19

members of the general public, <u>New Jersey v. T.L.O.</u>, 469 U.S. 325, 339-40 (1985); <u>see also</u> <u>Florida v. J.L.</u>, 529 U.S. 266, 274 (2000), searches of students conducted by school officials are therefore subject to a "reasonable grounds" standard.   <u>T.L.O.</u>, 469 U.S. at 342.   The applicability of <u>T.L.O.</u> to searches of students conducted on school grounds by police officers remains an open question.   <u>Id</u>. at 342 n.7 (reserving judgment on whether reasonable-grounds standard extends to searches "conducted by school officials in conjunction with or at the behest of law enforcement agencies").   When police are involved in searches initiated by school officials or where police involvement in the search is minimal, most courts have applied <u>T.L.O.</u>'s reasonable-grounds test in lieu of <u>Terry</u>'s reasonable-suspicion test.   <u>See</u> <u>State v. Angelia D.B.</u>, 211 Wis. 2d 140, 151-52 (1997) (collecting cases).   However, courts have consistently applied traditional Fourth Amendment standards to searches initiated and conducted by police on school grounds that are not requested or authorized by school officials.

20

See, e.g., Shade v. City of Farmington, 309 F.3d 1054
(8th Cir. 2002); Rudolph v. Lowndes County Bd. Of Ed.,
242 F. Supp. 2d 1107, 1114 (M.D. Ala. 2003)(Albritton,
C.J.); Angelina D.B., 211 Wis. 2d at 152-53 (collecting
cases).  Because school officials did not request that
Deputy Sheriff Smith search M.D. and were in no way
involved in the frisk, this court will apply the
traditional Terry standard.

In applying Terry's reasonable-suspicion standard,
courts are not guided by a "neat set of legal rules."
Ornelas v. United States, 517 U.S. 690, 695-96 (1996)
(internal quotations omitted).  Rather, courts must
examine the totality of the circumstances of each case to
see whether the detaining officer has a particularized
and objective basis "to believe that he is dealing with
an armed and dangerous person."  Terry, 392 U.S. at 27.
As stated, "[t]he officer need not be absolutely certain
that the individual is armed; the issue is whether a
reasonably prudent man in the circumstances would be
warranted in the belief that his safety or that of others

was in danger.  Id.  The Eleventh Circuit Court of Appeals has not addressed the precise factual scenario presented by this case: whether an uncorroborated anonymous tip that "someone" would be armed, but providing no physical description of the suspect, is sufficient to justify a frisk of a person who was stopped on reasonable suspicion of an unrelated non-violent crime.  Generally, officers may not frisk persons they stop on reasonable suspicion of committing non-violent crimes, like disorderly conduct, absent some facts suggesting the particular person is armed and dangerous. See Ybarra v. Illinois, 444 U.S. 85, 94 (1979) ("The narrow scope of the Terry exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked." (internal quotations and footnote omitted)); cf. Terry, 392 U.S. at 23-24.

Although an anonymous tip is not sufficient, by itself, to justify a stop, the Supreme Court has expressly declined to consider the effect of an anonymous

tip on reasonable suspicion to <u>frisk</u>.   <u>Florida v. J.L.</u>,
529 U.S. 266, 274 (2000).  The Supreme Court's discussion
of anonymous tips in <u>J.L.</u> is nonetheless instructive.
There, police received an anonymous tip that a young
black male in a plaid shirt standing at a particular bus
stop was carrying a gun.  Responding to this tip, the
police stopped and frisked J.L., a young black male
standing at that particular location wearing a plaid
shirt, and seized a gun from his pocket.  In affirming
the suppression of the gun, the Court reiterated "the
requirement that an anonymous tip bear standard indicia
of reliability in order to justify a stop."  <u>Id</u>. at 274.
The Court found that the tip before it lacked even a
"moderate indicia of reliability" because the identity of
the informant was unknown and the tip lacked predictive
information which could test the informant's knowledge or
credibility.  <u>Id</u>. at 271.

    The tip in the instant case suffers from greater
deficiencies than the tip in <u>J.L.</u>  As in <u>J.L.</u>, the tip
was received over the phone from an unknown source, was

23

uncorroborated by any independent police work or observations, and provided no predictive information. This tip also failed to provide a physical description of the suspect, like sex, race, height, or what the suspect was wearing.  Not only was this tip unreliable in its "assertion of illegality," but also in "its tendency to identify a determinate person."  J.L., 529 U.S. at 272.

Although the anonymous tip was insufficient by itself to establish reasonable suspicion that M.D. was armed and dangerous, the totality of the circumstances may still support an inference that M.D. was the subject of the tip.  Deputy Sheriff Smith unquestionably faced a situation wrought with uncertainty and charged with potential for harm.  Nonetheless, no evidence suggested that M.D., as opposed to any other student in the parking lot, was armed: the tip did not specifically identify M.D. as being armed, see Adams v. Williams, 407 U.S. 143 (1972); M.D. did not reach into his pockets or move

aggressively, <u>see</u> <u>J.L.</u>, 529 U.S. at 271-72;[16] and Smith did not see a bulge in M.D.'s clothes resembling a concealed weapon, <u>see</u> <u>Pennsylvania v. Mimms</u>, 434 U.S. 106 (1977).   The only factor that distinguished M.D. from every other student present in the parking lot at the time of the frisk was M.D.'s failure to obey immediately a police order.   However, "'[r]efusal to cooperate [with a police officer], without more, does not furnish the minimal level of objective justification needed for a detention or seizure.'"   <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123 (2000) (quoting <u>Florida v. Bostick</u>, 501 U.S. 429 (1991)).   The absence of any evidence linking M.D. to the tip suggests that Smith's frisk of M.D. was based on the generalized "inchoate and unparticularized suspicion or 'hunch,'" denounced in <u>Terry</u>, 392 U.S. at 27.

---

16. Although it is undoubtedly true that officers may frisk stopped persons who attempt to reach into their pockets, the facts viewed in the light most favorable to M.D. reveal that Smith seized and frisked M.D. <u>before</u> he reached into his pocket.

The opposite conclusion would give police nearly unbridled authority in situations involving uncorroborated anonymous tips that "someone" has a firearm: an officer could search anyone who fails to comply with an officer's order, even if the officer's order is impossible to comply with, as was the case here. It would be but a small step to allow officers to search <u>anyone</u> they encounter while investigating the anonymous tip because that person <u>might</u> be the armed suspect.  Such a result is insupportable because the Supreme Court has expressly rejected the notion that the Fourth Amendment's requirement of reasonableness and individualized suspicion is suspended when officers respond to allegations of an armed person, <u>J.L.</u>, 529 U.S. at 272. Accordingly, the court concludes that the frisk violated M.D.'s Fourth Amendment right to be free from unreasonable searches and seizures.

## ii.  Clearly established law

In determining whether a right was clearly established, courts may examine whether case law existing at the time of the violation would put a reasonable officer on notice that the officer's conduct violates constitutional rights.  <u>See</u> <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1351 (11th Cir. 2002).  The Eleventh Circuit frames this inquiry as whether the officer had "arguable reasonable suspicion" for the search or seizure.  <u>Brent v. Ashley</u>, 247 F.3d 1294, 1303 (11th Cir. 2001).

As already noted, neither the Supreme Court nor the Eleventh Circuit has considered a case where an anonymous tip of an armed person on school grounds converged with a student's failure to obey a police officer's orders. Because this case presents an uncharted question of Fourth Amendment jurisprudence, a reasonable officer in Deputy Sheriff Smith's position could believe that M.D.'s failure to obey Smith provided reasonable suspicion that M.D. was armed, even without any evidence linking the anonymous tip to M.D.  Moreover, in <u>T.L.O.</u>, the Supreme

27

Court left open, and the Eleventh Circuit has yet to consider, whether searches conducted by police officers on school grounds that are not requested by school officials are governed by <u>Terry</u>.  Finally, this court appears to be the first to consider whether the Supreme Court's recent decision in <u>Devenpeck</u> undermines the holding in <u>Knowles</u> that an officer cannot conduct a search incident to arrest absent a full custodial detention.

Because the law is unsettled in several areas relevant to this case, Deputy Sheriff Smith did not have "fair notice," <u>Vinyard</u>, 311 F.3d at 1350, that his actions violated M.D.'s Fourth Amendment right.  He therefore possessed arguable reasonable suspicion to conduct the frisk and is entitled to qualified immunity on the unreasonable search-and-seizure claim.

## 2. Excessive-Force claim

### i. Constitutional violation

When a search or seizure is unlawful, claims that the amount of force used during the search or seizure was excessive are generally subsumed in the search-and-seizure analysis because any amount of force is excessive when there is no legal basis for a stop.  <u>Jackson v. Sauls</u>, 206 F.3d 1156, 1171 (11th Cir. 2000).  Although the frisk of M.D. was unlawful, Deputy Sheriff Smith has been excused for conducting the frisk because he had arguable reasonable suspicion that M.D. was armed. Therefore, M.D.'s contention that Smith used excessive force to effectuate the frisk must be considered separately.  <u>See</u> <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1197 (11th Cir. 2002) (citing <u>Sauls</u>, 206 F.3d at 1171).[17]

_____

17. Although "the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment," <u>Nolin v. Isbell</u>, 207 F.3d 1253, 1257 (11th Cir. 2000), this analysis only applies to cases involving custodial arrests, <u>see</u> <u>id</u>. at 1255-57 (citing cases, all of which involved arrests, applying de minimis rule).  Because (continued...)

"Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Ferraro, 284 F.3d at 1197 (citing Graham v. Connor, 490 U.S. 386, 394-95 (1989)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." Graham, 490 U.S.

---------------------------------

17.(...continued)
this case involves a Terry stop and frisk, where as far as the law is concerned there is no basis to conclude (that is, no probable cause to believe) a citizen has done anything illegal, the rule on de minimis force is inapplicable and the general reasonableness standard governs. As the Supreme Court has aptly stated, "Even a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." Terry, 392 U.S. at 24. To add to this the unnecessary slamming of the head of a child (be he from a rich or poor family) into a car on school property should not go without redress.

at 396-97 (internal quotations and citations omitted).
In deciding "whether the force used to effect a
particular seizure is 'reasonable' under the Fourth
Amendment," courts must consider "the severity of the
crime at issue, whether the suspect poses an immediate
threat to the safety of the officers or others, and
whether he is actively resisting arrest or attempting to
evade arrest by flight." Id. at 396.  It is well-settled
that the force used by the officer must be reasonably
proportionate to the need for force in light of these
factors.  Ferraro, 284 F.3d at 1198.

    Here, Deputy Sheriff Smith elected to effectuate his
frisk by first slamming M.D. into the car with force
sufficient to cause M.D.'s head to dent the car.  At the
time of the frisk, M.D. was complying with Smith's order
to exit his vehicle, had not reached into his pockets or
made any furtive movements, was not attempting to flee,
and was not otherwise resisting Smith's investigation.
Nothing in M.D.'s conduct suggested that he posed an
immediate threat to Smith or others as he was exiting the

car.  Indeed, Smith himself acknowledged that he had no reason to believe that M.D. posed a risk to his or anyone else's safety.[18]  Simply put, even though M.D. _may_ have possessed a gun, which can certainly be a serious crime with a potential for harm to the officer or others, under the circumstances it was wholly unnecessary to slam M.D. into the car before frisking him.

Essentially, the only possible justification for Smith's use of force was the arguable reasonable suspicion that M.D. was armed or dangerous.  However, every frisk must be justified in the first instance by reasonable suspicion that the stopped person is armed or dangerous.  Terry, 392 U.S. at 27.  To hold that such reasonable suspicion is sufficient to justify the level of force used here would be the same as authorizing such

_____

18. Although the court does not consider an officer's subjective intent under the Fourth Amendment, Smith's admission here provides insight into objective circumstances leading up to the frisk.  Smith's admission indicates that, objectively speaking, nothing in M.D.'s conduct suggested that he posed a risk to officer safety at the time Smith frisked him.

32

use of force in every Terry stop and frisk, even if the
stopped person is cooperating and not actually posing an
immediate threat to the officer.  Not only would such an
outcome be unreasonable, it would also clearly be at odds
with Graham and Terry.

In announcing a balancing test for excessive-force
claims in Graham, the Supreme Court stated that every
excessive-force inquiry "requires careful attention to
the facts and circumstances of each particular case."
Graham, 490 U.S. at 396.  Allowing officers to apply the
amount of force at issue here simply because they suspect
a person is armed or dangerous, i.e., absent anything
beyond the suspicion that initially justified the frisk,
would actually be a bright-line test and not a balancing
test.   If officers can always apply such force when
conducting a frisk, the second and third factors in
Graham would be meaningless and the admonition to pay
"careful attention" to the circumstances of the case
would be superfluous.  This court cannot read Graham to
require   a   court   to   ignore   the   totality   of   the

33

circumstances and only consider one factor when weighing the reasonableness of the force at issue, especially when <u>Graham</u> explicitly mandates that courts do the opposite.

     <u>Terry</u> itself also dispels the notion that the amount of force used here is a necessary part of every frisk. The officer in <u>Terry</u> had reasonable suspicion that the suspects were about to commit an armed robbery of a shop on a busy thoroughfare in broad daylight. Only after his preliminary inquiries received "mumbled" non-responses did the officer grab one of the stopped persons, turn him around, and pat down his outer clothing. 392 U.S. at 6-7. In approving of the officer's conduct, the Court noted that the frisk was "carefully restricted ... to what was appropriate to the discovery of the particular items which he sought" and "carefully limited [to] the outer clothing of [the stopped person]". <u>Id</u>. at 30. The Court also made clear that the purpose of protective frisks is only to "determine whether [a stopped person] is in fact carrying a weapon and to neutralize the threat of physical harm," <u>Terry</u>, 392 U.S. at 24, and that a

34

frisk must be "confined in scope to an intrusion reasonably designed" to discover weapons, id. at 29. It is not necessary to slam a stopped person into a stationary object to discover weapons. Such force is warranted only if the person makes a threatening movement or resists the officer's first attempt to frisk. Thus, implicit in Terry is the recognition that officers usually can "discover weapons which might be used to assault [them]," id. at 30, without recourse to the amount of force Smith used here.

Based on the totality of circumstances, the court can discern no reason, let alone a legitimate law-enforcement need, for applying the force Deputy Sheriff Smith used to effectuate the frisk. See Ferraro, 284 F.3d at 1198. Nothing in M.D.'s conduct leading up to the frisk suggests that Smith could not have conducted his frisk in safety without slamming M.D.'s head into his car with such force as to cause dent in the trunk. Although the court is loath to apply the "20/20 vision of hindsight" to criticize "every push or shove" from "the peace of a

35

judge's chambers," Graham, 490 U.S. at  396, the court cannot conclude that slamming M.D. against a car in order to effectuate the frisk was reasonable under these circumstances.

The court therefore holds that Deputy Sheriff Smith's use of force here was "plainly excessive" and "wholly unnecessary" in these circumstances. Ferraro, 284 F.3d at 1198.  In so holding, the court is not suggesting that a police officer cannot lay hands upon or otherwise restrain a stopped person before conducting a pat down. The court is simply holding that a stopped person must do something beyond being suspected of possessing a weapon before an officer can apply the level of force used here to effectuate the frisk.  This is particularly true when a stopped person is actively complying with the officer's requests.

## ii. Clearly established

In the Eleventh Circuit, "unless a controlling and factually similar case declares the official's conduct

36

unconstitutional, an excessive-force plaintiff can overcome qualified immunity only by showing that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw." Smith v. Maddox, 127 F.3d 1416, 1419 (11th Cir. 1997). M.D. cites no case, and the court has found none, in which the amount of force used here to effectuate a frisk was found to violate the Fourth Amendment.

M.D. can therefore prevail only if Deputy Sheriff Smith's "conduct was so far beyond the hazy border between excessive and acceptable force that [Smith] had to know he was violating the Constitution even without caselaw on point." Id. Under this test, the law is clearly established, and qualified immunity can be overcome, if the standards set forth in Graham and the Eleventh Circuit's case law "inevitably lead every reasonable officer in [the defendant's] position to

conclude the force was unlawful." <u>Priester v. City of</u>
<u>Riviera Beach</u>, 208 F.3d 919, 927 (11th Cir. 2000).

The qualified-immunity inquiry here comes down to
whether every reasonable officer would know that absent
<u>something</u> more than a reasonable suspicion that a stopped
person may be armed or dangerous it is unlawful to
effectuate a frisk by slamming the person's head against
a car with force sufficient to dent the car.   The
Eleventh Circuit has "repeatedly held that police
officers cannot use force that is 'wholly unnecessary to
any legitimate law enforcement purpose.'" <u>Mercado v. City</u>
<u>of Orlando</u>, 407 F.3d 1152, 1160 (11th Cir. 2005) (quoting
<u>Ferraro</u>, 284 F.3d at 1199).   Even though Smith was
justified in frisking M.D., a reasonable officer could
not possibly have believed that it was necessary to slam
M.D.'s head against the car in order to safely effectuate
a frisk in these circumstances.   Any reasonable officer
would know that such grossly disproportionate force was
unnecessary because M.D. was exiting the vehicle in
compliance with Smith's order, was not struggling, did

not reach into his pockets or make furtive movements, and did not attempt to flee.

The fact that M.D. "did not suffer greater injury to [his] head as a result of it being slammed against the trunk of a car does not alone" render the force used reasonable. Ferraro, 284 F.3d at 1200. Courts "do not use hindsight to judge the acts of police officers," but rather "look at what they knew (or reasonably should have known) at the time of the act." Rodriguez v. Farrell, 280 F.3d 1341, 1352-53 (11th Cir. 2002). Just as reasonable force does not become excessive if it aggravates a pre-existing injury unknown to the officer, "objectively unreasonable force does not become reasonable simply because the fortuity of the circumstances protected the plaintiff from suffering more severe physical harm." Ferraro, 284 F.3d at 1200.

Qualified immunity exists to shield officers from liability in close cases where a reasonable officer could have believed the action in question was lawful. Id. However, where, as here, it is "clear beyond all doubt"

that the force was unnecessary and unreasonable under
Graham, qualified immunity is not appropriate. Id. At
the core of the Fourth Amendment is the understanding
that officers cannot unnecessarily harm suspects in the
course of arresting or otherwise seizing them. See,
e.g., Ferraro, 284 F.3d at 1199 (denying qualified
immunity based on clearly excessive force by officer who
slammed suspect into car after she had been handcuffed);
Priester, 208 F.3d at 926-27 (denying qualified immunity
in light of clearly excessive force to officer who
allowed police dog to attack arrestee who had already
followed officer's order to lie down on ground); Maddox,
127 F.3d at 1419 (11th Cir. 1997) (denying qualified
immunity based on clearly excessive force by officer who
broke arm of suspect who "docilely submitted" to
officer's order to "get down"). A reasonable police
officer would therefore not need case law to know that
slamming a stopped person's head against a stationary
object in order to effectuate a frisk serves no
legitimate law-enforcement purpose absent something more

40

than reasonable suspicion that the person may be armed.
Accordingly, Deputy Sheriff Smith is not entitled to
qualified immunity on the excessive-force claim.


### B. Preclusion

The court now turns to Deputy Sheriff Smith's
preclusion defense.  Because only M.D.'s excessive-force
claim remains, the preclusion defense will be addressed
as to only that claim.


### 1. Collateral Estoppel

Under the doctrine of collateral estoppel (also known
as issue preclusion), "once a court decides an issue of
fact or law necessary to its judgment, that decision
precludes relitigation of the same issue on a different
cause of action between the same parties."  Kremer v.
Chemical Construction Corp., 456 U.S. 461, 467 n.6
(1982).  "Congress has specifically required all federal
courts to give preclusive effect to state-court judgments
whenever the courts of the State from which the judgments

emerged would do so." <u>Allen v. McCurry</u>, 449 U.S. 90, 96
(1980).  The Supreme Court has explicitly extended this
rule to § 1983 claims.  <u>See</u> <u>id</u>. at 95, 105; <u>see also</u>
Erwin Chemerinsky, Federal Jurisdiction § 8.10 (4th ed.
2003).

    Because M.D.'s juvenile adjudication occurred in
Alabama, this court will apply collateral estoppel only
if "the courts of [Alabama] would do so."  <u>Allen</u>, 449
U.S. at 96.  In Alabama, collateral estoppel bars
subsequent litigation only when the following elements
are present: "(1) [T]hat an issue in a prior action was
identical to the issue litigated in the present action;
(2) that the issue was actually litigated in the prior
action; (3) that resolution of the issue was necessary to
the prior  judgment; and (4) that the same parties are
involved in the two actions."  <u>Unum Life Ins. Co. of
America v. Wright</u>, 897 So.2d 1059, 1082-83 (Ala. 2004)
(internal quotations and citations omitted).

    Here, collateral estoppel will not bar M.D.'s
excessive-force claim because, as the record now stands,

there is no evidence that the claim was actually litigated during the juvenile proceedings. Nowhere in the excerpts of the juvenile-court record now before this court does the record suggest that M.D. raised the excessive-force claim during that proceeding. The juvenile-court judge's general observation that the allegations in the petition had been proven beyond a 'reasonable doubt'[19] hardly demonstrates that the juvenile court considered the excessive-force question and certainly does not prove that the question was actually litigated.

Even though collateral estoppel does not operate to preclude M.D. from bringing his excessive-force claim, it does not necessarily follow that testimony from his juvenile adjudication cannot be used as evidence against him. In Willingham v. Loughnan, the Eleventh Circuit Court of Appeals stated that, "although neither Heck nor

_____

19. Defendant's brief in support of motion for summary judgment (Doc. No. 18), Ex. B, Trial Record, p. 146.

43

[collateral estoppel] prevents Plaintiff's claims in this case, the doctrine of [collateral estoppel] does operate to limit what facts we accept were found by the jury in this civil case for the qualified immunity decision." 261 F.3d 1178, 1183 (11th Cir. 2001), <u>vacated and remanded on other grounds</u>, 537 U.S. 801 (2002).  In other words, even if collateral estoppel does not bar a § 1983 suit, it may limit what facts a § 1983 plaintiff can dispute on defendant's motion for summary judgment based on qualified immunity.

Here, the record contains no relevant findings of fact entered by the juvenile court.  To be sure, the juvenile court noted that "[t]here was yelling, yelling at the officers, you know, agitation," and "if it takes three officers to just put the man's hands on the back of the car, there is a little bit of violence caused."[20] However, neither observation is disputed by the parties

_____

20. Defendant's brief in support of motion for summary judgment (Doc. No. 28), Ex. B, Trial Transcript, p. 146.

on summary judgment.  M.D. acknowledges that he became
upset and raised his voice, and he also testified that
Deputy Sheriff Smith and at least two other officers
restrained him at some point late in the encounter.[21]
Also, the state-court judge's conclusion was based on
M.D.'s yelling <u>after</u> Smith had frisked him.  At issue
here is the constitutionality of the force used at the
initial stop and frisk, which caused M.D. to yell and
struggle with the police.


### 2. The <u>Heck</u> Doctrine

Although collateral estoppel does not preclude M.D.'s
§ 1983 excessive-force claim, the <u>Heck</u> doctrine may.  In
<u>Heck v. Humphrey</u>, the Supreme Court held that persons
convicted of crimes cannot bring a § 1983 claim that
would call into question the validity of an underlying
criminal conviction unless or until the conviction is
overturned.  512 U.S. 477, 486-87 (1994); <u>see</u> <u>also</u> Erwin

---

21. <u>See</u> <u>id</u>., Ex. G, Deposition of M.D., pp. 152, 158-
162.

45

Chemerinsky, Federal Jurisdiction § 8.4 (4th ed. 2003). In Alabama, however, juvenile adjudications and youthful offender determinations are not convictions. 1975 Ala. Code § 12-15-72 (juvenile court proceedings "shall not be considered to be a conviction or impose any civil disabilities ordinarily resulting from a conviction of a crime"); 1975 Ala. Code § 15-19-7 (youthful offender determinations "shall not be deemed convictions"); see also D.B. v. State, 861 So. 2d 4, 17 (Ala. 2003) (juvenile adjudications are not criminal convictions); Raines v. State, 294 Ala. 360, 365 (1975) (youthful offender proceedings are not criminal in nature because they are an extension of the juvenile process). Thus, it could be argued that M.D.'s excessive-force claim is not precluded by Heck because his adjudication was not a "conviction," Heck, 512 U.S. at 486.[22] Accord Green v. Montgomery, 95 N.Y.2d 693 (2001) (analyzing juvenile

_____

22. The record is unclear whether M.D. was adjudged a juvenile delinquent or a youthful offender. However, because neither is a conviction under Alabama law, the distinction is immaterial.

46

adjudication under statute nearly identical to Alabama's
under collateral estoppel instead of <u>Heck</u>).  This court,
however, need not resolve whether <u>Heck</u> applies to
juvenile adjudications because, even if it does, the
record here does not reflect, as shown above, that M.D.'s
excessive-force claim would call into question, or
otherwise undermine, his juvenile adjudication.  <u>See</u> <u>Dyer</u>
<u>v. Lee</u>, 488 F.3d 876 (11th Cir. 2007) (because § 1983
excessive-force claim did not necessarily contradict
resisting-arrest-with-violence conviction, <u>Heck</u> did not
bar claim.)


## V. STATE-LAW ASSAULT CLAIM

Under Article I, § 14 of the Alabama Constitution, "a
sheriff ... is immune ... from suit based on state law
claims arising out of the execution of the duties of his
office, except for actions brought (1) to compel him to
perform his duties, (2) to compel him to perform
ministerial acts, (3) to enjoin him from enforcing
unconstitutional laws, (4) to enjoin him from acting in

47

bad faith, fraudulently, beyond his authority, or under mistaken interpretation of the law, or (5) under the Declaratory Judgment Act to seek construction of a statute." Boshell v. Walker County Sheriff, 598 So.2d 843, 844 (Ala. 1992) (citing Parker v. Amerson, 519 So.2d 442, 445 (Ala. 1987)).    As the "alter ego" of the sheriff, deputy sheriffs also enjoy this so-called 'state immunity.' Ex parte Haralson, 853 So.2d 928, 932 (Ala. 2003).    Only the fourth exception to state immunity is relevant here.    Although the court concluded that Deputy Sheriff Smith's decision to slam M.D. into the car violated M.D.'s clearly established Fourth Amendment right, which arguably constitutes action taken in bad faith, outside his authority, or under a mistaken interpretation of the law, M.D. seeks monetary damages, as opposed to injunctive relief.    Thus, the exception does not apply, and the claim is barred.

Although M.D. brings this suit against Smith in his individual, as opposed to official, capacity, that distinction is immaterial here.    First, state immunity

protects state officers in their official <u>and</u> individual capacities when "the action is, in effect one against the State." <u>Alexander v. Hatfield</u>, 652 So.2d 1142, 1143 (Ala. 1994).  An action against a sheriff or a deputy sheriff "for damages arising out of performance of his duties is 'essentially a suit against the state.'" <u>Ex parte Blankenship</u>, 893 So.2d 303, 305 (Ala. 2004) (quoting <u>Parker</u>, 519 So.2d at 445).  Thus, state immunity bars actions against deputy sheriffs in their individual and official capacities if the damages allegedly arose out of their performance of official duties.  <u>See</u> <u>King v. Colbert Co.</u>, 620 So.2d 623, 626 (Ala. 1993) (holding that plaintiff failed to state a claim against sheriff in his individual capacity because the sheriff committed the alleged misconduct in the course of his official duties and, therefore, in his official capacity only).

This conclusion is confirmed by the Alabama Supreme Court's recent decision in <u>Ex parte Blankenship</u>, where a deputy sheriff killed another motorist in a traffic accident allegedly caused by the deputy's wantonness.

49

893 So.3d at 305.   The court held that state immunity applied and dismissed the case because it was "alleged in the complaint and admitted in the answer that Deputy Blankenship was acting in the line and scope of his duties."   Id.   Here, as in <u>Blankenship</u>, the complaint alleges that Smith was on duty when he confronted M.D. and was acting in his official capacity to disperse students from the school parking in light of security concerns.[23]

Deputy Sheriff Smith is therefore entitled to state immunity, which bars M.D.'s claim for assault.

***

For the foregoing reasons, the court concludes that Deputy Sheriff Smith is entitled to summary judgment on M.D.'s Fourteenth Amendment claim, Fourth Amendment search-and-seizure claim, and state-law assault claim.

---

23. Complaint (Doc. No. 1), ¶ 7.

50

This case will proceed to trial solely on M.D.'s Fourth Amendment excessive-force claim.

DONE, this the 27th day of August, 2007.

_____/s/ Myron H. Thompson_____
UNITED STATES DISTRICT JUDGE